**PUBLISH**

**February 22, 2012**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff–Appellee,

v.

GLENN J. DAMATO,

      Defendant–Appellant.

No. 10-3191

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:08-CR-20048-CM-1)**

Melanie Susan Morgan, Morgan Pilate LLC, Olathe, Kansas, for the Defendant-Appellant.

Leon Patton, Assistant United States Attorney, (Barry R. Grissom, United States Attorney, with him on the briefs), Office of the United States Attorney, District of Kansas, Kansas City, Kansas, for the Plaintiff-Appellee.

Before **LUCERO**, **SEYMOUR**, and **EBEL**, Circuit Judges.

**LUCERO**, Circuit Judge.

Glenn Damato appeals his 96-month sentence for conspiracy to distribute marijuana. He argues that the district court erred in calculating drug quantity by including as relevant conduct a drug transaction that occurred more than thirteen years prior to the offense of conviction. The government argues only that this transaction was part of the "same course of conduct" as the offense of conviction. See U.S.S.G. § 1B1.3(a)(2). We cannot agree with the government's contention. The thirteen-year interval at issue far exceeds the gap between relevant conduct and the charged offense in the case law of any circuit including our own. Further, that extreme lack of temporal proximity was not mitigated by strong evidence of regularity or similarity. To the contrary, the government presented no evidence of regularity for an eight-year block of time between the putatively relevant conduct and the charged offense. And the government's evidence with respect to similarity, while substantial, was not so powerful as to compensate for the weight we must accord the temporal proximity and regularity factors given their extraordinary status in this case.

We nevertheless exercise our discretion to consider an alternative basis to affirm, and conclude that the prior transaction qualifies as relevant conduct because it and the offense of conviction were part of a "common scheme or plan." See id. The earlier conduct was substantially connected to the offense of conviction; both featured common co-conspirators who worked together to procure a distribution quantity of marijuana from a source in Southern California. Because of this substantial connection, the prior transaction qualifies as relevant conduct.

-2-

We reject Damato's remaining contentions that that the district court should not have sentenced him as a leader or organizer of the charged conspiracy, and that his below-Guidelines sentence was substantively unreasonable. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

**A**

In August of 2004, a drug dog alerted to a package sent from Mark McPherson in Olathe, Kansas to Leon Livingston in San Diego, California. The package contained $30,000 in cash. When Livingston attempted to retrieve the package, he was arrested. An ensuing investigation revealed a cross-country, marijuana-distribution conspiracy involving Damato, McPherson, Livingston, Harold Michael Bower, Neal Limtiaco, Thomas Starr, and others.

McPherson, Bower, and Starr were indicted in April of 2006. All three eventually pled guilty to federal drug charges and provided statements detailing their involvement in drug trafficking. In April of 2008, Damato was charged with conspiracy to distribute 100 kilograms or more of marijuana along with Livingston and Limtiaco. The indictment alleged a conspiracy beginning in or about December 2003, and continuing to approximately March 30, 2006. All three defendants pled guilty. As with the previously indicted co-conspirators, Livingston and Limtiaco cooperated with law enforcement.

**B**

Damato pled guilty without the benefit of a plea agreement. The United States

Probation Office prepared a Presentence Investigation Report ("PSR") for Damato. Based on interviews of McPherson, Starr, Livingston, and Bower, along with information provided by law enforcement, the PSR attributed 782 kilograms of marijuana to Damato. This total included four transactions in which marijuana was seized from co-conspirators by police, and an estimate based on the amount of marijuana that could be purchased with the $30,000 seized in August 2004.

Although some of the drugs attributed to Damato had been physically seized by police, most of the drug quantity calculation derived from statements of co-conspirators. McPherson described two loads of marijuana delivered to Damato and Starr in 2003 or 2004, which he estimated contained 120 pounds each. Livingston stated that he received four or five packages of $30,000 from McPherson prior to his arrest (other than the package that had been seized), which the PSR estimated would purchase 68 kilograms of marijuana. Finally, Starr indicated that he helped to transport four loads of marijuana between October 2004 and August 2005, each of which contained 150 to 200 pounds. All of the transactions included in the PSR—both those for which drugs were recovered, and those in which no drugs were recovered—occurred between 2003 and 2006 during the charged conspiracy.

The PSR also included background information obtained from interviews with McPherson, Starr, and Bower. According to McPherson, he and Damato met in 1981. Damato was engaged in marijuana distribution at that time, with his suppliers located in Florida. McPherson was also engaged in marijuana distribution, and was using Starr to

-4-

transport loads across the country. Sometime in the mid to late 1980s, Damato switched to a pair of marijuana suppliers located in California, one of whom was Livingston. However, McPherson stated that he and Damato were not "partners" then.

Around the same time, McPherson introduced Bower to Damato. McPherson had been using Bower as a driver to distribute marijuana, and Bower began working for Damato as well. Bower stated that he delivered marijuana five or six times for Damato in the 1990s, until he was arrested in 1995. Bower was incarcerated from 1995 to 2003.

McPherson also served time in prison in the 1990s. After he was released, McPherson reunited with Damato, who said he was still in the marijuana business and was still working with Starr. Damato and McPherson began purchasing marijuana from Livingston in 2003, and continued to do so until August 2004 when Livingston was arrested. Following Livingston's arrest, they began buying marijuana from Limtiaco. Starr, Bower, and others were paid to drive marijuana from California to various points in the Midwest during this time period. These delivery trips formed the basis of the PSR's drug quantity calculation.

Using a drug quantity estimate of 782 kilograms, the PSR recommended a base offense level of 30. It added four levels under U.S.S.G. § 3B1.1(a) because Damato was a leader or organizer of an extensive drug operation and subtracted three levels for acceptance of responsibility, yielding a total offense level of 31. Combined with a criminal history category of I, Damato's advisory Guidelines range was calculated at 108 to 135 months.

## C

Damato objected to both the drug quantity calculation and to the leader or organizer enhancement. Specifically, Damato argued that he was not involved in a transaction in which three pounds of marijuana were seized, with the transaction which led to the seizure of $30,000 in cash, or with one of the transactions from which drugs were not recovered. He also objected to the "paragraphs within the [PSR] based on cooperator Mark McPherson's statement that [Damato] was involved."

The government also objected to the PSR's drug quantity estimate. It submitted a spreadsheet listing nineteen total transactions which the government claimed involved Damato. The spreadsheet indicates that the factual bases for the transactions were statements from McPherson and Bower, along with "hotel records, GPS tracking information, and law enforcement reports." The spreadsheet attributed 2298 pounds (1042.4 kilograms) of marijuana to Damato from seventeen transactions alleged to have occurred during the charged conspiracy. It also included two additional transactions as relevant conduct: A 1995 occurrence in which Bower was arrested with 62.5 pounds (28.35 kilograms) of marijuana, and a January 1990 incident in which McPherson and Livingston were arrested for attempting to purchase 1200 pounds (544.32 kilograms) of marijuana from an undercover Drug Enforcement Agency ("DEA") agent. The government thus argued that Damato was responsible for a total of 3560.5 pounds (1615 kilograms).

The district court held a sentencing hearing to consider these objections. Robert

Hawkins, a financial investigator for the DEA, was the only witness to testify. Hawkins provided hearsay testimony relayed from co-conspirators McPherson, Bower, Livingston, and Limtiaco, along with information contained in various law enforcement reports. He claimed that "for a period [of] probably 25 years," Damato, McPherson, Bower, Livingston, "and others were for the most part trafficking marijuana, one or more of them all the time."

Hawkins discussed the support behind the nineteen entries in the government's spreadsheet. He provided a detailed description of the first fifteen transactions, all of which occurred between 2003 and 2006. Many of these transactions were supported by hotel records and GPS tracking data that had been obtained by law enforcement.

In addition, Hawkins provided testimony on the two claimed relevant conduct transactions. He stated that McPherson and Livingston had been arrested, and eventually served time, for attempting to purchase 1200 pounds of marijuana from an undercover DEA agent in January of 1990. Based on statements from Bower, McPherson, and Livingston, Hawkins testified that Damato had been involved in the transaction, and was at Livingston's home waiting for McPherson and Livingston to return with the drugs. Damato left the house with a bag of cash when he learned of the arrest and was never apprehended. Hawkins further testified about statements made by Bower regarding a 1995 transaction. As the PSR indicated, Bower delivered five or six loads of marijuana for Damato in the 1990s. In 1995, Bower was arrested while transporting 62.5 pounds of marijuana.

At the close of the sentencing hearing, the district court sustained both Damato's and the government's drug quantity objections. It removed the three specific transactions to which Damato objected, but added the additional drug quantity listed on the government's spreadsheet—including the two relevant conduct transactions. With these adjustments, the district court attributed 1515.8 kilograms of marijuana to Damato, for a base offense level of 32. Damato objected to the court's consideration of "alleged conduct that took place back in 1990" as relevant to "the conspiracy that was charged from 2003 to 2006," but the court was not persuaded. It also rejected Damato's objection to the leader or organizer enhancement. Adding four levels for that enhancement, and subtracting three levels for acceptance of responsibility, the court adopted a total offense level of 33 and a criminal history category of I. Damato's Guidelines range was 135 to 168 months. However, the court settled on a below-Guidelines sentence of 96 months.

Damato timely appealed the sentence imposed.

## II

On appeal, Damato contends the district court erred in calculating drug quantity and in applying the leader or organizer enhancement. A claim that a district court improperly calculated an advisory Guidelines range implicates procedural reasonableness. See United States v. Huckins, 529 F.3d 1312, 1317 (10th Cir. 2008). In considering such a claim, "[w]e review the district court's factual finding supporting a determination of relevant conduct for clear error but review the ultimate determination of

-8-

relevant conduct de novo." United States v. Tran, 285 F.3d 934, 938 (10th Cir. 2002); see also United States v. Egbert, 562 F.3d 1092, 1096-97 (10th Cir. 2009).

Damato also argues that his sentence is substantively unreasonable. "[S]ubstantive reasonableness addresses whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." United States v. Huckins, 529 F.3d 1312, 1317 (10th Cir. 2008) (quotation omitted). We review substantive reasonableness claims for abuse of discretion. United States v. Lewis, 594 F.3d 1270, 1277 (10th Cir. 2010). "A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." Id.

### III

The parties have helpfully narrowed for us the scope of Damato's drug quantity claim. Damato admits that he is responsible for 683.8 kilograms of the marijuana listed in the PSR. And he further admits that he is responsible for 45.36 kilograms that were not contained in the PSR but considered at the sentencing hearing. Thus, there is no dispute that Damato was responsible for at least 729.16 kilograms of marijuana.

That stipulated quantity would place Damato at a base offense level of 30, which applies when 700 to 1000 kilograms of marijuana are attributed to a defendant. U.S.S.G. § 2D1.1(c)(5). Damato was sentenced under U.S.S.G. § 2D1.1(c)(4), which provides for a base offense level of 32 when a defendant is responsible for 1000 to 3000 kilograms of marijuana. Accordingly, the question before us is whether Damato should have been

sentenced under U.S.S.G. § 2D1.1(c)(5) or (c)(4). And that question turns on the propriety of counting a single transaction: the 1990 incident in which McPherson and Livingston were arrested while attempting to purchase 1200 pounds of marijuana. Regardless of the other alleged incidents, Damato should be sentenced under U.S.S.G. § 2D1.1(c)(5) if this transaction qualifies but subsection (c)(4) if it does not. Cf. United States v. Wilken, 498 F.3d 1160, 1170 (10th Cir. 2007) (erroneous Guidelines calculation is harmless if it has no effect on a defendant's Guidelines range).

Under U.S.S.G. § 1B1.3, a defendant's base offense level is based on "relevant conduct." Relevant conduct is defined to include:

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
     (B) in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense; [and]

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction . . . .

U.S.S.G. § 1B1.3(a).

It is a given that the 1990 transaction does not qualify under subsection (1). The offense of conviction was a conspiracy beginning around December, 2003—more than a decade after the 1990 occurrence—and there is no evidence suggesting that the earlier transaction was conducted "in preparation for" the later conspiracy. U.S.S.G.

-10-

§ 1B1.3(a)(1). If the 1990 transaction is to be counted, it must qualify as "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).[1]

Our circuit has distinguished between the phrases "same course of conduct" and "common scheme or plan." See United States v. Svacina, 137 F.3d 1179, 1182 (10th Cir. 1998); see also U.S.S.G. § 1B1.3 app. n.9(B) ("Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct . . . ."). At sentencing, the district court did not indicate which prong it applied. The government relies exclusively upon the "same course of conduct" prong on appeal.

## A

Two offenses qualify as part of the "same course of conduct" if "they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3 app. n.9(B). We consider "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." Id.; see also United States v. Roederer, 11 F.3d 973, 979 (10th Cir. 1993) ("Similarity, regularity, and temporal proximity are the significant elements to be evaluated." (citation omitted)). In weighing

---

[1] Section 3D1.2(d) requires the grouping of multiple counts "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm . . . ." Damato's crime qualifies as a crime in which the offense level is determined largely by the "quantity of substance involved." Id.

-11-

these factors, we utilize the "sliding scale" approach mandated by U.S.S.G. § 1B1.3. See

United States v. Hill, 79 F.3d 1477, 1484 (6th Cir. 1996). As an application note

provides:

> When one of the above factors is absent, a stronger presence of at least one
> of the other factors is required. For example, where the conduct alleged to
> be relevant is relatively remote to the offense of conviction, a stronger
> showing of similarity or regularity is necessary to compensate for the
> absence of temporal proximity.

U.S.S.G. § 1B1.3 app. n.9(B). Although we have construed relevant conduct to cover a

broad range of activities, see United States v. Garcia, 411 F.3d 1173, 1177 (10th Cir.

2005), we are mindful that "[o]ffenses of the same kind, but not encompassed in the same

course of conduct or plan, are excluded," United States v. White, 888 F.2d 490, 500 (7th

Cir. 1989).

**1**

We begin our analysis with temporal proximity. Damato was convicted of

engaging in a conspiracy that began in or about December 2003. McPherson and

Livingston attempted to purchase 1200 pounds of marijuana in January 1990, more than

thirteen years prior to the offense of conviction. As the government acknowledged at

oral argument, treating conduct separated by that length of time as part of the same

course of conduct would be unprecedented. None of the cases cited by the government

contain such a lengthy gap between potentially relevant conduct and the crime of

conviction, nor have we discovered any in our independent research. In fact, we have

been unable to uncover a case holding that conduct even half as temporally distant

-12-

qualifies as relevant conduct. The largest time difference we have observed in the case law is the five-year interval at issue in Roederer, 11 F.3d 973.

Further, the five-year delay in Roederer appears to be an outlier.[2] We have described a "fifteen month interval" as "temporally distant." United States v. Clark, 415 F.3d 1234, 1242 (10th Cir. 2005). Other circuits have held that temporal gaps as brief as five months cut against a finding that an activity was part of the same course of conduct as the offense of conviction. See United States v. Hahn, 960 F.2d 903, 910-11 (9th Cir. 1992) (five-month gap is "relatively remote"); see also United States v. McGowan, 478 F.3d 800, 802 (7th Cir. 2007) (eight-month "gap is long enough to cast doubt on the relevance of the earlier conduct"); United States v. Ortiz, 431 F.3d 1035, 1041 (7th Cir. 2005) (ten-month "gap suggests the lack of a common plan or course of conduct"); United States v. Mullins, 971 F.2d 1138, 1144 (4th Cir. 1992) (temporal proximity factor "extremely weak . . . if present at all, as the uncharged conduct took place over six months prior to the two phone calls underlying the offense of conviction"). And courts have repeatedly held that temporal proximity is lacking or that conduct is very remote

---

[2] In considering transactions that occurred five years apart, other circuits have been reluctant to regard the prior transaction as relevant to a given conspiracy. See, e.g., United States v. Mankiewicz, 122 F.3d 399, 405 (7th Cir. 1997) (remanding for further explanation because the record revealed "nothing about the 5-year period between the transactions"); United States v. Fermin, 32 F.3d 674, 681-82 (2d Cir. 1994) (reversing sentence because district court included as relevant conduct an incident that occurred five years before offense of conviction), overruled on other grounds, Bailey v. United States, 516 U.S. 137 (1995).

when the interval exceeds one year.  See United States v. Kulick, 629 F.3d 165, 171, 172 (3d Cir. 2010) (twenty-seven month interval is "substantial" and "temporally remote"); Hill, 79 F.3d at 1484 ("[W]e find that temporal proximity is extremely weak in that nineteen months is an exceedingly long lapse between offenses."); United States v. Sykes, 7 F.3d 1331, 1337 (7th Cir. 1993) (temporal gap of fourteen months "tends to indicate conduct that can easily be separated into discrete, identifiable units rather than behavior that is part of the same course of conduct" (quotation omitted)).

The Fifth Circuit accurately summarized the bulk of the case law in stating: "Various courts have found that a period of separation of over one year negated or weighed against [a finding of] temporal proximity." United States v. Wall, 180 F.3d 641, 646 (5th Cir. 1999).  With this consensus in mind, it clearly follows that the thirteen-year interval between the 1990 transaction and Damato's offense of conviction is extraordinary.  Given this extreme lack of temporal proximity, the 1990 transaction may not be treated as relevant conduct unless one of the other factors—regularity or similarity—is "authoritatively present."  Miller, 179 F.3d 961, 967 n.10 (5th Cir. 1999); see U.S.S.G. § 1B1.3 app. n.9(B) ("When one of the above factors is absent, a stronger presence of at least one of the other factors is required.").

**2**

The government has not made such a showing with respect to regularity.  "To determine whether 'regularity' is present, we inquire whether there is evidence of a regular, i.e., repeated, pattern of similar unlawful conduct" between "the purported

-14-

relevant conduct and the offense of conviction." United States v. Rhine, 583 F.3d 878, 889-90 (5th Cir. 2009). The government presented a great deal of regularity evidence for the time period during the charged conspiracy. Its spreadsheet contains seventeen transactions between "late 2003" and November 2006. Fourteen of these transactions occurred between February 2004 and November 2006. Each of the transactions included between 100 and 200 pounds of marijuana being driven across the country.

However, evidence regarding Damato's activities between 1990 and 2003 is exceedingly sparse. Bower claimed that he delivered marijuana on Damato's behalf five or six times between 1990 and 1995, when Bower was arrested transporting a load. But the government presented no evidence of regularity for the 1995 to 2003 time frame. When McPherson was released from prison in 2002 or 2003, he met up with Damato, who reported that he was "still" in the marijuana business and was using Starr as a driver. Hawkins relayed this statement at the sentencing hearing, noting that Starr worked as a driver for Damato while McPherson was in prison. The government presented no other evidence regarding the eight-year gap between Bower's arrest in 1995 and the beginning of the charged conspiracy in 2003.[3]

Although the record supports an inference that Damato was somehow involved in

---

[3] Bower also stated that Damato continued to engage in marijuana distribution after McPherson was incarcerated. However, this statement clearly refers to the 1990 to 1995 time period. Immediately after the statement, Bower explains that he drove five or six loads of marijuana in the 1990s. And Bower himself was incarcerated from 1995 to 2003.

marijuana distribution between 1995 and 2003, there is no evidence whatsoever regarding the regularity of such distribution. The record does not tell us when or how often Damato used Starr as a driver during this time frame. There is evidence, however, suggesting that Damato's drug distribution activities would have been dissimilar to those during the charged conspiracy. See Rhine, 583 F.3d at 890 (regularity inquiry looks for a "pattern of similar unlawful conduct"). Three of Damato's primary co-conspirators, McPherson, Livingston, and Bower, were incarcerated during this time period. McPherson was in prison following his 1990 arrest until 2002 or 2003. Livingston also served time following he and McPherson's attempted purchase of 1200 pounds of marijuana from a DEA agent. And Bower was jailed from 1995 to 2003. The PSR also notes that Damato was diagnosed with a relapse of lymphoma in 1995 and underwent chemotherapy and a stem cell transplant.

It was established that Damato engaged in five or six transactions between 1990 and 1995, and that Damato was somehow involved in marijuana distribution when McPherson was released from prison in 2002 or 2003. But the government has not presented evidence of regularity for eight of the thirteen years between the 1990 transaction and the crime of conviction. Given this eight-year dark period, we are compelled to conclude that regularity, like temporal proximity, is lacking. See United States v. Clark, 415 F.3d 1234, 1241 (10th Cir. 2005) (regularity absent when record does not show drug transactions over two-year period); see also United States v. Culverhouse, 507 F.3d 888, 897 (5th Cir. 2007) ("[F]ive offenses over the course of fifteen years,

separated as they are by time and circumstances, cannot be considered repetitious or regular conduct to a degree significant enough to constitute sufficient connection under the [G]uidelines." (quotation omitted)).

**3**

We turn to the similarity prong. During the charged conspiracy, Damato and McPherson regularly had Livingston purchase between 100 and 200 pounds of marijuana from Limtiaco in San Diego. The co-conspirators then used a variety of drivers—frequently Starr and Bower—to transport the marijuana to locations in the Midwest. The 1990 transaction shares several characteristics with the crime of conviction. Both involved marijuana, the participants Damato, Livingston, and McPherson, and a location in Southern California. See United States v. Caldwell, 585 F.3d 1347, 1352-53 (10th Cir. 2009) (similarity established by showing conduct involving same drug, same accomplices, and occurring in same geographic area for relevant conduct separated from charged conduct by eighteen months).

However, there are several important differences between the transactions included in the charged conspiracy and the 1990 transaction. First, the amount McPherson and Livingston attempted to purchase in 1990 was much larger than the purchases that occurred during the charged conspiracy. Most of the transactions included in the offense of conviction involved 100 to 120 pounds of marijuana, and none exceeded 200 pounds. The 1990 transaction, in contrast, involved 1200 pounds—an order of magnitude greater than the usual amount involved in the charged conduct. See Hill, 79

-17-

F.3d at 1484 (drug transactions dissimilar, in part because "quantities involved in each deal differ substantially").

Second, the 1990 transaction and the conspiracy transactions involved different sources. Limtiaco was the drug source during the charged conspiracy. Yet there is no suggestion that Limtiaco was involved in the 1990 transaction. To the contrary, the putative source in that deal was an undercover DEA agent. Although both transactions occurred in the same general geographic area, we must be careful not to consider similarity "at such a level of generality as to eviscerate the evaluation of whether uncharged criminal activity is part of the 'same course of conduct or common scheme or plan' as the offense of conviction." Mullins, 971 F.2d at 1145; see also Hill, 79 F.3d at 1483 ("When considering the similarity factor, the conduct should not be considered at a level of generality that would render worthless the relevant conduct analysis."). The fact that the drug suppliers were unrelated is significant.

Third, the record is essentially devoid of evidence regarding Damato's role in the 1990 transaction. Hawkins testified that Livingston was responsible for taking delivery of the marijuana, and that McPherson was in possession of the cash intended to cover the purchase price. As to Damato, Hawkins testified only that "Damato was at Leon Livingston's home waiting" and that Damato "ditched a bag of cash" after fleeing. It is thus difficult to compare Damato's role in the 1990 transaction to his role in the offense of conviction. See United States v. Moore, 130 F.3d 1414, 1418 (10th Cir. 1997) ("In assessing a defendant's course of conduct, the court is to consider such factors as the

-18-

nature of the defendant's acts, his role, and the number and frequency of repetitions of those acts." (quotation omitted)).

Fourth, the record does not establish whether the 1990 transaction shared a similar modus operandi with the transactions included in the charged conspiracy. Given the quantity involved, we can infer that the 1200 pounds McPherson and Livingston attempted to purchase was destined for distribution. However, the government did not present any evidence regarding the manner in which those drugs would have been distributed. In contrast, the transactions included in the offense of conviction generally shared a similar transportation and distribution scheme.

**4**

We conclude that the 1990 transaction was similar to the charged conduct to a moderate degree, but that this level of similarity falls short of compensating for the extreme lack of temporal proximity and the absence of evidence regarding regularity. See U.S.S.G. § 1B1.3 app. n.9(B) ("When one of the above factors is absent, a stronger presence of at least one of the other factors is required."). We stress that the level of similarity at issue here would qualify the 1990 transaction as part of the same course of conduct in many cases, but the extraordinary—indeed unprecedented—temporal remoteness coupled with the absence of regularity evidence in this case is unique. In Caldwell, for example, the level of similarity between the relevant conduct and offense of conviction was reasonably close to the level of similarity here. See 585 F.3d at 1352-53. But the conduct in that case was separated from the offense conduct by approximately

-19-

eighteen months, id. at 1351, and the government established that the defendant "regularly engaged in conduct that was similar to the conduct of conviction," id. at 1352.

As noted above, we apply a "sliding scale" analysis to determine whether a transaction qualifies as part of the "same course of conduct." See Hill, 79 F.3d at 1484. That scale is tipped decidedly against the government in this case as a result of the thirteen-year gap between the claimed relevant conduct and the charged offense. In addition to this strongly mitigating factor, the government failed to establish regularity over an eight-year period. With these two factors weighing so strongly against a finding of relevant conduct, the government's substantial similarity evidence is simply not enough to qualify the 1990 transaction.

Although the temporal element factors very heavily into this decision, we emphasize that all three factors must be considered in determining whether an offense qualifies as part of the "same course of conduct," and that "each case depends largely on its own facts." Roederer, 11 F.3d at 979 (quotation omitted). Further, we do not purport to establish a bright-line cutoff for temporal proximity beyond which conduct will never qualify. In Roederer, for example, we excused a five-year gap—much longer than the typical relevant conduct interval—based on the strength of the other two factors: The government showed that the defendant had engaged in nearly identical transactions "on a continuous basis" for the vast majority of the five-year period. See 11 F.3d at 980. In this case, however, we cannot accept the government's claim that conduct thirteen years prior to the offense of conviction qualified as part of a same course of conduct.

**B**

The government does not argue that the 1990 transaction qualifies under the "common scheme or plan" prong, which provides an independent basis for holding a prior act to be relevant conduct. See Svacina, 137 F.3d at 1182 ("This court has agreed with the Second Circuit distinction between the terms 'same course of conduct' and 'common scheme or plan.'"). And although we generally "will not craft a party's arguments for him," Perry v. Woodward, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999), we do have "discretion to affirm on any ground adequately supported by the record." Davis v. Roberts, 425 F.3d 830, 834 (10th Cir. 2005) (quotation omitted); see also United States v. Lott, 310 F.3d 1231, 1242 n.7 (10th Cir. 2002) ("This court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." (quotation omitted)).

We exercise our discretion to consider an alternative theory only when "the appellant has had a fair opportunity to address that ground." Alpine Bank v. Hubbell, 555 F.3d 1097, 1108 (10th Cir. 2009) (quotation omitted). Damato was provided such an opportunity in this appeal. He acknowledged in the Opening Brief that "relevant conduct can be conduct that is part of the same course of conduct or common scheme or plan as the offense of conviction" and that the district court "failed to state under which theory it was proceeding." Despite his recognition that the 1990 transaction might qualify as relevant conduct under the common scheme or plan prong, Damato did not discuss this

-21-

prong. He did, however, have a fair opportunity to do so.[4]

We have identified several guiding factors in determining whether to consider an alternative theory: "[1] whether the ground was fully briefed and argued here and below; [2] whether the parties have had a fair opportunity to develop the factual record; and [3] whether, in light of factual findings to which we defer or uncontested facts, our decision would involve only questions of law." Elkins v. Comfort, 392 F.3d 1159, 1162 (10th Cir. 2004) (citations omitted). In the case at bar, the first of these factors has not been met. Neither party argued the common scheme or plan prong before the district court or this court.

Both the second and third Elkins factors, however, weigh in favor of considering the alternative ground. The government argued below that the 1990 transaction constituted relevant conduct without limiting itself to either of the available prongs. Specifically, it presented evidence regarding the 1990 transaction from Hawkins, but did not focus on one prong of the relevant conduct inquiry to the exclusion of the other. See United States v. Hinojosa, 484 F.3d 337, 340 (5th Cir. 2007) (noting the two relevant conduct prongs "are closely related concepts"). Although Damato's counsel elected not to cross examine Hawkins about the 1990 transaction, Damato was afforded "a fair opportunity to develop the factual record." Elkins, 392 F.3d at 1162. He was on notice

---

[4] Damato appears to complain that the district court did not specify which of the prongs it was applying. Although identifying which of the relevant conduct prongs is being applied is the better practice, we have never held that a district court is required to announce the portion of U.S.S.G. § 1B1.3(a)(2) it concludes is relevant.

-22-

that the government sought to include the 1990 transaction as relevant conduct and was free to present evidence at the sentencing hearing.

The third Elkins factor, whether the issue is one of law "in light of factual findings to which we defer or uncontested facts," id., also supports an analysis of the common scheme or plan prong. In reviewing a district court's sentencing determination, we defer to its factual findings unless clearly erroneous and "view the evidence and inferences therefrom in the light most favorable to the district court's determination." United States v. Beltran, 571 F.3d 1013, 1020 (10th Cir. 2009). But "the ultimate determination of relevant conduct" is a legal question we review under a de novo standard. Tran, 285 F.3d at 938.

Because we reject the government's theory on appeal, and because Damato had a fair opportunity to argue whether the 1990 transaction qualifies under the common scheme or plan prong, we exercise our discretion to consider this legal question. We caution the government in future cases, however, that consideration of an unargued issue is committed to our discretion.

### C

A prior offense may qualify as relevant conduct under the common scheme or plan prong if it is "substantially connected to [the offense of conviction] by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3 app. n.9(A). A Guidelines application note provides the following example of a common scheme or plan:

the conduct of five defendants who together defrauded a group of investors by computer manipulations that unlawfully transferred funds over an eighteen-month period would qualify as a common scheme or plan on the basis of any of the above listed factors; i.e., the commonality of victims (the same investors were defrauded on an ongoing basis), commonality of offenders (the conduct constituted an ongoing conspiracy), commonality of purpose (to defraud the group of investors), or similarity of modus operandi (the same or similar computer manipulations were used to execute the scheme).

Id.

We have repeatedly noted the distinction between the two relevant conduct prongs. Although "a common scheme or plan may require some connection between the acts by common participants, purpose, or overall scheme, the analysis of same course of conduct focuses on whether there is a pattern of criminal conduct." Svacina, 137 F.3d at 1182 (quotations omitted); see also Roederer, 11 F.3d at 979 ("Common identity of co-conspirators, which could be a key factor in identifying a common scheme or plan, . . . may be unnecessary in determining whether a defendant himself has engaged in a pattern of criminal behavior – the focus of the same course of conduct inquiry." (quotation and alteration omitted)). As these quotations suggest, the common course of conduct prong usually covers a broader array of conduct than does the common scheme or plan prong. See United States v. West, 643 F.3d 102, 111 (3d Cir. 2011) ("[A]lthough there is substantial overlap between the terms 'common scheme' and 'course of conduct,' the latter envelops a greater sphere of activity than the former." (citation omitted)).

Nevertheless, in certain circumstances, acts that do not qualify under the same course of conduct prong may be part of a common scheme or plan as the offense of

-24-

conviction. Course of conduct is therefore broader in the sense that it sometimes permits the inclusion of conduct less similar to the offense of conviction than does a common scheme or plan. It provides greater latitude with respect to similarity because the government is constrained by the regularity and temporal proximity factors when proceeding under a course of conduct theory. As explained in Section II.A, supra, even conduct that is fairly similar to the offense of conviction fails to qualify as part of the same course of conduct if it is temporally distant and the government does not establish regularity. But such conduct, if it shares a substantial connection to the offense of conviction, may constitute part of a common scheme or plan. See U.S.S.G. § 1B1.3 app. n.9(A) (acts are part of a common scheme or plan if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi").

We conclude that this case presents one of the rare instances in which acts that were not part of the same course of conduct as the offense of conviction nonetheless qualify as part of a common scheme or plan. As discussed in Section II.A.3, supra, the 1990 transaction and the offense of conviction were similar in many respects. Both involved the sale of large amounts of marijuana, and both involved Damato obtaining (or attempting to obtain) marijuana from a source located in Southern California. And importantly, Damato conspired with the same individuals—McPherson and Livingston— in both instances. "Common identity of participants and similar role in the activity are the key factors in identifying whether the uncharged drug activities were part of a

common scheme or plan." United States v. Rios, 22 F.3d 1024, 1028 (10th Cir. 1994); see also Roederer, 11 F.3d at 979 ("Common identity of co-conspirators . . . could be a key factor in identifying a common scheme or plan . . . ." (quotation omitted)).

Although we are troubled by the evidentiary gaps in the record regarding Damato's role in the 1990 transaction and the modus operandi underlying it, we nevertheless conclude that it was part of a common scheme or plan with the offense of conviction. According to Hawkins, Damato was "involved in [the 1990] deal." Specifically, Damato was waiting at Livingston's home while Livingston and McPherson carried out the transaction with the agent they believed to be a marijuana supplier. After Livingston and McPherson were arrested, Damato was tipped off. He "ran out of the house, hid in some nearby bushes, took off his running suit, ditched a bag of cash that he had with him, and got away." Hawkins learned this information from debriefings with McPherson, Livingston, and Bower.

Although this evidence is somewhat thin with respect to Damato's involvement, viewed in the light most favorable to the government, see Beltran, 571 F.3d at 1020, it shows that Damato conspired with McPherson and Livingston to obtain a distribution quantity of marijuana from a Southern California source. Damato's decision to flee and his possession of a "bag of cash" further support such an interpretation of Hawkins' otherwise ambiguous statement that Damato was "involved" in the 1990 transaction. And given that Damato's conduct involved the same co-conspirators as the offense of conviction, the same drug, and the same source location, we hold that the 1990

-26-

transaction qualifies as relevant conduct under the common scheme or plan prong.

Damato complains that Hawkins' testimony is too unreliable to carry the government's burden of proving relevant conduct by a preponderance of the evidence. See United States v. Fortier, 180 F.3d 1217, 1225 (10th Cir. 1999). However, we have consistently held that "hearsay statements may be considered at sentencing if they bear some minimal indicia of reliability." United States v. Cook, 550 F.3d 1292, 1296 (10th Cir. 2008) (quotation omitted). Hawkins' testimony regarding the 1990 transaction clears this low hurdle. There is no doubt that the 1990 transaction occurred; both McPherson and Livingston served time for their role in the attempted purchase. And because both co-conspirators had already been convicted for the 1990 transaction, neither had a strong incentive to shift blame to Damato. We thus hold that Hawkins' statements regarding the 1990 transaction bore the minimal indicia of reliability necessary.

In sum, although we reject the government's argument that the 1990 transaction was part of the same course of conduct as the offense of conviction, we conclude that the transaction qualified as relevant conduct under the common scheme or plan prong. Accordingly, we reject Damato's challenge to the district court's drug quantity calculation.

**IV**

In addition to his drug quantity objection, Damato also argues that the district court erred in imposing a four-level enhancement for his role as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

U.S.S.G. § 3B1.1. Damato contends the evidence was insufficient to establish that he acted as a leader or organizer.

To determine whether a defendant qualifies as a leader or organizer, the Guidelines direct us to consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1(a) cmt. n.4. Further, a defendant need not lead or organize at least five individuals. Rather, the criminal activity must include five or more participants (or be otherwise extensive). U.S.S.G. § 3B1.1. A defendant may be eligible for the leader or organizer enhancement if he leads or organizes even one other participant. See United States v. Hamilton, 587 F.3d 1199, 1222 (10th Cir. 2009).

We uphold the district court's conclusion that Damato qualifies as a leader or organizer. McPherson's statements contained in the PSR show that Damato and McPherson flew out to see Livingston after he was arrested to "figure out how they were going to operate the business." At the sentencing hearing, Hawkins explained that most of the marijuana deliveries were taken to Damato, or split between Damato and McPherson. When Livingston introduced other members of the conspiracy to the supplier Limtiaco, Damato met with Limtiaco first. By monitoring conspirators' phone calls, the government was able to establish that Damato almost certainly made more calls

to Limtiaco than other members of the conspiracy. Limtiaco stated that that it appeared that Damato was "in charge." In light of this evidence, we cannot say that the district court clearly erred in classifying Damato as a leader or organizer of the conspiracy.

We also reject Damato's argument that evidence supporting the enhancement was inherently unreliable. As previously noted, "hearsay statements may be considered at sentencing if they bear some minimal indicia of reliability." Cook, 550 F.3d at 1296. Hawkins, a member of the DEA investigative team, testified that the co-conspirator statements he relayed at the sentencing hearing were corroborated by telephone records, hotel records, and GPS tracking data. Hearsay statements relayed by various co-conspirators were largely consistent with each other. This corroboration provides the necessary indicia of reliability

## V

Lastly, we consider the substantive reasonableness of Damato's sentence. Damato was sentenced below his advisory Guidelines range. As such, his sentence is presumed to be reasonable. See United States v. Balbin-Mesa, 643 F.3d 783, 788 (10th Cir. 2011). In attempting to rebut this presumption, Damato offers a single argument: He contends that his sentence is disparate to that of his co-conspirators.

Under 18 U.S.C. § 3553(a)(6), sentencing courts should "avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." Damato complains that his co-conspirators received lesser sentences than his own. But we have repeatedly explained that § 3553(a)(6) "requires a judge to take into

account only disparities <u>nationwide</u> among defendants with similar records and Guideline

calculations. It is not reversible error for a sentencing court to adhere to this

interpretation in its exercise of sentencing discretion." <u>United States v. Verdin-Garcia</u>,

516 F.3d 884, 899 (10th Cir. 2008) (citations omitted). Damato has not presented any

evidence suggesting his sentence is problematic in this sense.

Further, because "avoidance of unwarranted disparities was clearly considered by

the Sentencing Commission when setting the Guidelines ranges," a district court that

"carefully reviewed the Guidelines range . . . necessarily gave significant weight and

consideration to the need to avoid unwarranted disparities." <u>Gall v. United States</u>, 552

U.S. 38, 54 (2007). "We have interpreted <u>Gall</u> to conclude that . . . § 3553(a) does not

require a consideration of co-defendant disparity." <u>United States v. Martinez</u>, 610 F.3d

1216, 1228 (10th Cir. 2010) (citation omitted).

In any event, Damato has not shown that he was similarly situated to his

codefendants. Although counsel questioned Hawkins regarding the lengths of several co-

conspirators' sentences, the record does not actually establish the length of several of

their sentences. The record lacks information as to the manner in which all of the co-

conspirators' sentences were calculated. Only McPherson's record is discussed in detail,

and the difference between his and Damato's sentence is explained by the substantial

assistance McPherson rendered to the government. A "sentencing disparity produced by

substantial assistance departures was intended by Congress." <u>United States v. Candia</u>,

454 F.3d 468, 476 (5th Cir. 2006) (quotation omitted). Accordingly, such a sentencing

difference does not constitute an "unwarranted sentence disparit[y]."  18 U.S.C. § 3553(a)(6).

## VI

For the foregoing reasons, we **AFFIRM** the district court's sentencing determination.