**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

CHRISTOPHER CRAIG,

     Defendant - Appellant.

No. 14-3185

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:12-CR-20141-KHV-18)**
_____

Rick E. Bailey, Conlee, Schmidt & Emerson, L.L.P., Wichita, Kansas, for Defendant-Appellant.

Carrie N. Capwell, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with her on the brief), Office of the United States Attorney, Kansas City, Kansas, for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, Chief Judge, **BALDOCK** and **HARTZ**, Circuit Judges.
_____

**BALDOCK**, Circuit Judge.
_____

In 2013, a grand jury charged Defendant Christopher Craig with three separate counts as part of a twenty-seven-count indictment containing nine other co-defendants. The first count charged Defendant with conspiring to (a) manufacture,

possess with intent to distribute, and distribute cocaine, cocaine base, and marijuana in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841 & 846, and (b) maintain a drug-involved premises in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 846 & 856. The other two counts charged Defendant with using a communication facility to commit this conspiracy in violation of 21 U.S.C. § 843(b). After Defendant pleaded guilty to these charges, the district court at sentencing calculated his total offense level as 43 after applying a murder cross-reference under United States Sentencing Guidelines (U.S.S.G.) § 2D1.1(d), a leadership enhancement under U.S.S.G. § 3B1.1(a), and an obstruction of justice enhancement under U.S.S.G. § 3C1.1. Combined with his category III criminal history, this corresponded to a sentence of life imprisonment for the conspiracy count and 48 months' imprisonment for the two communications facility counts. Defendant now asks us to rule that the district court erred in applying these enhancements and imposing the life sentence on him. Exercising jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we affirm.

I.

The overarching conspiracy in which Defendant was involved operated in the Kansas City area and lasted from January 2006 until December 2012. Two men, Gregory Moore and Daniel Bryant, headed the conspiracy with the general purpose of distributing marijuana, cocaine, and cocaine base around the Kansas City metropolitan area. Defendant and others helped allocate these substances at Moore's and Bryant's direction.

After several encounters with law enforcement officers throughout the six

2

years the conspiracy operated, Defendant's most significant criminal foray came in August 2012 when he organized the attempted robbery of rival drug-dealer Brandon Campbell. He recruited two cousins, DaRyan Pryor and Arterrius Pryor, to actually commit the robbery.[1] Defendant drove DaRyan and Arterrius to an apartment complex in south Kansas City, gave them guns and T-shirts to wear as face masks, and remained in the driver's seat of his vehicle and watched while the two men attempted to rob Campbell in the parking lot of the complex. In the midst of the robbery attempt, Campbell drew his gun and shot DaRyan. DaRyan later died from his wounds.

Defendant went to DaRyan's mother's residence the next day and explained to her, DaRyan's stepfather, and other family members what had happened the previous night. He made clear that he, DaRyan, and Arterrius "went to go hit a lick," which is "street slang for a robbery and commonly for drugs." Sent. Tr. vol. 1, 29:4–5, 190:20–21, Aug. 20, 2014. Defendant told the family that the purpose of the "lick" was "to get a kilo of cocaine," which he referred to as a "bird." *Id.* at 196:25, 197:5. He further admitted that he had provided the guns to DaRyan and Arterrius and had driven them to the apartment complex, and he also explained that although he had discussed the possibility of such a robbery with DaRyan for a while, he had initially not wanted to involve DaRyan and only did so because DaRyan "was hard up for money." *Id.* at 174:1–2.

---

[1] To avoid confusion, we refer to DaRyan Pryor and Arterrius Pryor by their first names.

Defendant and DaRyan had been more than mere acquaintances: DaRyan had been living with Defendant for approximately two months prior to the attempted robbery, and during this time Defendant had been paying all of DaRyan's living expenses. In exchange for Defendant's hospitality, DaRyan had been working for Defendant selling marijuana. DaRyan's mother even alleged that DaRyan and Defendant may have been in the "marijuana *and* cocaine" business with each other. *Id.* at 162:11 (emphasis added). Reflecting on the relationship between Defendant and DaRyan, she also stated that "when he would talk about [Defendant] . . . he was just like he thought [Defendant] was God, honestly. [Defendant] did everything for him." *Id.* at 161:23–162:1.

Law enforcement officers eventually arrested Defendant for his involvement in the drug-trafficking operation, and a November 2013 grand jury charged him in a second superseding indictment with the conspiracy count and the two communication facility counts. Although this indictment charged nine other members of the drug-trafficking operation, it did not list either DaRyan or Arterrius as co-conspirators. Moreover, Defendant was not charged with the murder of DaRyan.

Nonetheless, once Defendant pleaded guilty to the three charges against him, the Presentence Investigation Report (PSR) suggested the district court take DaRyan's death into account when evaluating Defendant's sentence. This suggestion stemmed from a cross-reference in U.S.S.G. § 2D1.1—the section of the Guidelines

4

that provided the applicable sentencing range for Defendant's convictions[2]—that states, "If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 . . . apply § 2A1.1 (First Degree Murder) . . . as appropriate." U.S. Sentencing Guidelines Manual § 2D1.1(d)(1) (2013).[3] First Degree Murder, in turn, includes "[e]very murder . . . committed in the perpetration of, or *attempt to perpetrate*, any . . . robbery." 18 U.S.C. § 1111(a) (emphasis added). Based on this textbook codification of the felony-murder rule, the PSR suggested the district court raise Defendant's base offense level to 43 in compliance with § 2A1.1 because Defendant would have been responsible under 18 U.S.C. § 1111 for DaRyan's death during the attempted robbery. *See* U.S.S.G. § 2A1.1.

In accordance with § 3B1.1(a) of the Sentencing Guidelines, the PSR further labeled Defendant as "an organizer or leader of a criminal activity" because he organized the robbery that DaRyan and Arterrius committed. U.S.S.G. § 3B1.1(a). The PSR therefore recommended the district court add four additional levels under § 3B1.1(a) to Defendant's base offense level of 43. U.S.S.G. § 3B1.1(a). And finally, the PSR suggested the district court raise Defendant's base offense level an additional two levels under § 3C1.1 for obstruction of justice. U.S.S.G. § 3C1.1.

---

[2] Defendant's three convictions were grouped together for guideline calculation purposes. *See* U.S. Sentencing Guidelines Manual § 3D1.2(d) (2013). This resulted in § 2D1.1 governing the base offense level for all three convictions. *See id.* § 3D1.3(b).

[3] "The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11(a) (2015). As the 2013 Sentencing Guidelines were in effect on the day Defendant was sentenced, we utilize that edition of the Guidelines throughout the course of this appeal.

5

The basis for this recommendation originated from an event after Defendant's arrest when the Government had sought a voice exemplar from Defendant pursuant to a court order, he had not complied, and the district court had held Defendant in contempt of court.

After factoring in an additional two levels for reckless endangerment for an unrelated high-speed chase with police and a decrease of two levels for Defendant's acceptance of responsibility, the PSR calculated Defendant's total offense level as 49, which it then decreased to the maximum-allowed level of 43. *See* U.S.S.G. Ch. 5, Pt. A, cmt. n.2 ("An offense level of more than 43 is to be treated as an offense level of 43."). Combined with his category III criminal history, this corresponded to a sentence of life imprisonment for the conspiracy count and 48 months' imprisonment for the communication facility counts.[4]

At the sentencing hearing, Defendant objected to the PSR's recommendations that the district court apply the murder cross-reference, the leadership enhancement, and the obstruction of justice enhancement. Regarding the murder cross-reference, Defendant contended that although DaRyan's murder had taken place during the time the conspiracy had operated, DaRyan himself was not involved in this conspiracy and therefore his death could not appropriately be linked to Defendant's conspiracy conviction. Defendant also stated that "there is no evidence that this attempted

---

[4] The conspiracy conviction had a statutory maximum sentence of life imprisonment while the communication facility counts had statutory maximum of 48 months' imprisonment. Thus, even though the Guidelines also recommended Defendant receive life in prison for the communication facility counts, the district court could not sentence Defendant to more than four years for these convictions.

6

robbery gone bad was in furtherance of the conspiracy. There's just no evidence at all in that regard." Sent. Tr. vol. 2, 319:4–7, Aug. 28, 2014. The district court did not buy this argument:

> THE COURT: Part of what you're talking about doesn't really resonate with me because, you know, I've been hearing these cases for almost 23 years and it's, I would say, such common knowledge that drug dealers rob each other to steal money and drugs and they carry weapons to execute robberies and to defend themselves from robberies. That it seems based on these facts, you could make a reasonable conclusion from the evidence which was presented that this robbery was part of the drug conspiracy activities.
>
> ***
>
> THE COURT: The [robbery's] connection [to the drug conspiracy] is your client [Defendant]. I don't know what more damning connection you could be asking for.

*Id.* at 317:5–16, 320:24–321:1. The district court adopted the PSR's recommendation and held the murder cross-reference should be applied:

> THE COURT: I think the only reasonable conclusion that you could draw from the evidence here is that the robbery and death did occur in connection with the conspiracy. It constitutes relevant conduct for purposes of the sentencing guidelines.

*Id.* at 326:10–15.

Defendant also based his objection to the leadership enhancement on his contention that no evidence connected the attempted robbery and DaRyan's death to the conspiracy. But because the district court had concluded this connection did exist, the court likewise concluded the leadership enhancement should apply. Defendant further argued the obstruction of justice enhancement should not apply because he had purged himself of his contempt by pleading guilty. The district court

7

rejected this argument in light of § 3C1.1's language that "attempt[s] to obstruct" can warrant the two-level enhancement, and it again adopted the PSR's recommendation.

Finally, Defendant argued a sentence of life imprisonment for the conspiracy count was substantially greater than necessary under the 18 U.S.C. § 3553(a) sentencing factors. The district court also dismissed this contention:

> THE COURT: [W]hy would we sentence him the same as somebody that did not enlist other people to commit crimes which result in death and did not organize or lead the conspiracy? Why would it make sense to treat him as if these facts didn't exist?

Sent. Tr. vol. 2, 344:22–345:2.

In the end, the district court adopted the PSR's suggested sentence in its entirety and sentenced Defendant to life imprisonment for the conspiracy count and 48 months' imprisonment to run concurrently for the communication facility counts. Defendant now timely appeals and argues the district court erred in applying the murder, leadership, and obstruction of justice enhancements. He also renews his argument from the district court that a sentence of life imprisonment is substantively unreasonable.[5]

## II.

---

[5] Defendant also argued in his Opening Brief that the district court could subject him to a statutory maximum sentence of only 40 years' imprisonment based on the amount of drugs attributed to him under the PSR. For this reason, he claimed the district court had violated his Sixth Amendment rights under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), when it applied the murder cross-reference and sentenced him to life imprisonment without submitting this issue to the jury. *Id.* at 490 ("[A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Defendant, however, expressly withdrew this argument during oral argument, and we therefore decline to address it.

Defendant first challenges the district court's decision to apply the murder cross-reference under U.S.S.G. § 2D1.1(d)(1) based on DaRyan Pryor's death during the attempted robbery of Brandon Campbell. He contends, as he did in the district court, that no evidence relates the attempted robbery or DaRyan's murder to the drug-trafficking conspiracy to which Defendant pleaded guilty. He therefore argues DaRyan's death is not "relevant conduct" to his conspiracy conviction under U.S.S.G. § 1B1.3, and because § 1B1.3(a) mandates cross-references can be applied only if they first qualify as relevant conduct, he argues the district court could not apply the murder cross-reference from § 2D1.1(d)(1). Because we conclude a preponderance of the evidence connects DaRyan's death with the drug-trafficking conspiracy, we hold the district court did not err in applying the murder cross-reference.

## A.

"When reviewing a district court's application of the Sentencing Guidelines, we review legal questions *de novo* and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Doe*, 398 F.3d 1254, 1257 (10th Cir. 2005) (quoting *United States v. Tsosie*, 376 F.3d 1210, 1217–18 (10th Cir. 2004)) (internal quotation marks omitted). A factual finding is clearly erroneous "only if [it] is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *United States v. Mullins*, 613 F.3d 1273, 1292 (10th Cir. 2010) (quoting *Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1263

9

(10th Cir. 2008)) (internal quotation marks omitted). These standards are straightforward in theory, but how do they apply when we must review a district court's determination that an act or event is relevant conduct under § 1B1.3?

The answer to this question has perplexed this Court. We have been inconsistent in our decisions about whether a relevant conduct determination is a factual finding we must review for clear error or a legal conclusion we must review de novo. One line of cases from this Court clearly states that the determination of relevant conduct "is a pure factual question for which the district court must make specific findings to support its sentence." *United States v. Moore*, 130 F.3d 1414, 1417 (10th Cir. 1997) (citing *United States v. Crockett*, 82 F.3d 722, 729–30 (7th Cir. 1996)); *see also, e.g.*, *United States v. Keifer*, 198 F.3d 798, 801 (10th Cir. 1999); *United States v. Cuthbertson*, 138 F.3d 1325, 1326 (10th Cir. 1998); *United States v. Richards*, 27 F.3d 465, 468 (10th Cir. 1994); *United States v. Washington*, 11 F.3d 1510, 1517 (10th Cir. 1993). Alternatively, another line of decisions has concluded we must "review the ultimate determination of relevant conduct de novo." *United States v. Caldwell*, 585 F.3d 1347, 1350 (10th Cir. 2009); *see also, e.g.*, *United States v. Irvin*, 682 F.3d 1254, 1277 n.20 (10th Cir. 2012); *United States v. Damato*, 672 F.3d 832, 838 (10th Cir. 2012); *United States v. Egbert*, 562 F.3d 1092, 1096–97 (10th Cir. 2009); *United States v. Osborne*, 332 F.3d 1307, 1311 (10th Cir. 2003); *United States v. Tran*, 285 F.3d 934, 938 (10th Cir. 2002); *United States v. Svacina*, 137 F.3d 1179, 1182 (10th Cir. 1998); *United States v. Slater*, 971 F.2d 626, 638 (10th Cir. 1992).

Today we need not solve this intra-circuit split, which has evolved over the course of more than two decades in a wide variety of factual and legal contexts. Instead, we give Defendant the benefit of the doubt and assume for the purposes of this appeal that a district court's ultimate determination of relevant conduct is a legal conclusion we review de novo. Even under this assumption, however, we must still review for clear error the district court's factual findings *supporting* its determination of relevant conduct. *Caldwell*, 585 F.3d at 1349–50. As a final point, relevant conduct must be proven by only a preponderance of the evidence. *See Damato*, 672 F.3d at 847 (citing *United States v. Fortier*, 180 F.3d 1217, 1225 (10th Cir. 1999)); *see also United States v. Watts*, 519 U.S. 148, 157 (1997).

B.

The question whether DaRyan's murder was relevant conduct to Defendant's conviction for the drug-trafficking conspiracy begins with U.S.S.G. § 1B1.3(a), which outlines the circumstances that determine relevant conduct:

> [C]ross references in Chapter Two . . . shall be determined on the basis of the following:
>
> (1)   (A)   all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . .
>
>           ***
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense; [and]
>
>           ***
>
> (3)   all harm that resulted from the acts and omissions specified in subsection[] (a)(1) . . . above, and all harm that was the object of

11

such acts and omissions[.]

U.S.S.G. § 1B1.3(a). We first note the attempted robbery of Brandon Campbell is the "act" referred to in subsection (1)(A), and DaRyan's death is the "harm that resulted" from this act under subsection (3). We also note Defendant "aided, abetted, . . . commanded, induced, [and] procured" this attempted robbery under subsection (1)(A) because he organized its commission and drove the getaway vehicle. Thus, as long as the attempted robbery "occurred during the commission of the offense of conviction"—the underlying conspiracy—DaRyan's murder will count as relevant conduct under subsection (3) and can be used to elevate Defendant's sentence.[6]

---

[6] We take this opportunity to clarify two points the parties sometimes overlooked or confused in their briefs. First, both parties assumed § 1B1.3(a)(1)(B), instead of § 1B1.3(a)(1)(A), must apply to determine whether DaRyan's death was relevant conduct that could be used to lengthen Defendant's sentence. This subsection states that "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," a defendant is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . that occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1)(B). Presumably, the parties zeroed in on the phrase "jointly undertaken criminal activity," reasonably concluded this jointly undertaken criminal activity referred to the attempted robbery, and therefore assumed subsection (1)(B) must apply simply because a jointly undertaken criminal activity existed. To be sure, it may very well be § 1B1.3(a)(1)(B) *could* apply. *See* U.S.S.G. § 1B1.3, cmt. n.2, illus. (a)(1) ("[A] defendant may be accountable for particular conduct under more than one subsection of this guideline."). But because Defendant had such a heavy hand in organizing the commission of the attempted robbery, we need not rely on subsection (1)(B), which is primarily utilized in circumstances where a defendant otherwise had no connection to the act at issue other than the jointly undertaken criminal activity of which he was a part. *See, e.g.*, *Osborne*, 332 F.3d at 1311; *United States v. Gamez*, 301 F.3d 1138, 1141 & n.1, 1146–47 (9th Cir.

Defendant, however, claims the attempted robbery did not "occur[] during the commission of the offense of conviction" because no evidence connects the attempted robbery to the underlying conspiracy. But here's what we know: (1) Defendant was convicted of conspiracy to manufacture, possess with intent to distribute, and distribute cocaine, cocaine base, and marijuana; (2) DaRyan had lived with Defendant for two months and worked for him selling marijuana; (3) DaRyan's mother later contended that Defendant and DaRyan may even have been in the "marijuana and cocaine" business with each other; (4) Defendant organized a robbery of a rival drug-dealer with the purpose of getting a "bird," i.e., a kilo of cocaine; and (5) DaRyan and Arterrius were the ones who actually committed this robbery. These facts lead us to two main conclusions. First, DaRyan more likely than not was a

_____

2002). Thus, § 1B1.3(a)(1)(A) is a more appropriate and simpler avenue for us to take to decide this issue, and we consequently decline to apply § 1B1.3(a)(1)(B).

Second, the parties sometimes alluded in their briefs to the belief that the "act" referred to in subsections (1)(A) and (1)(B) was DaRyan's death. But under either subsection, surely this act could refer to only the attempted robbery, and DaRyan's death was the "harm that resulted" from this act under subsection (3). Under subsection (1)(A), Defendant clearly did not command, induce, procure, or do anything else to willfully cause the *death* of DaRyan—he only commanded, induced, procured, and willfully caused the *robbery*. Indeed, DaRyan's murder in this case could only be reasonably classified as a type of felony murder, and like any felony murder, we look to the *underlying felony*—here, the attempted robbery—that caused the death to determine whether Defendant should be held responsible for it. *United States v. Nichols*, 169 F.3d 1255, 1272 (10th Cir. 1999) ("The [felony-murder] doctrine circumvents the normal *mens rea* requirements of first-degree murder and requires only an intent to commit the underlying felony."). And utilizing subsection (1)(B) instead of subsection (1)(A) would not have somehow transformed this act so that it instead referred to DaRyan's death: subsection (1)(B) states that any "act" must be "*in furtherance* of the jointly undertaken criminal activity," and Campbell, a *rival* drug-dealer of Defendant, obviously did not shoot DaRyan with the intent to further the objectives of the conspiracy that *Defendant* was a part of. Thus, under either subsection, the act must refer to the attempted robbery as a matter of logic.

13

member of the conspiracy given he was selling marijuana on Defendant's behalf for at least two months and, according to his mother, perhaps even cocaine, and the conspiracy centered around the sale of marijuana and cocaine. *See* Sent. Tr. vol. 2, 322:7–12, Aug. 28, 2014 ("[W]e [the Government] have established that there was a conspiracy involving DaRyan Pryor and I've told the Court that, but for his death, DaRyan Pryor would have been charged and would be present in this case in some form or fashion.").[7] DaRyan's status as a co-conspirator only helps show the attempted robbery was in furtherance of the underlying conspiracy because such a status undercuts Defendant's argument that the robbery was a separate undertaking unrelated to the conspiracy.

But DaRyan need not have been a co-conspirator at all. Our primary concern is not whether *DaRyan* was involved in the conspiracy but rather whether *Defendant* organized the robbery to further the goals of the conspiracy in which he participated. This leads us to our second conclusion: even assuming *arguendo* DaRyan was not a member of the conspiracy, Defendant more likely than not procured the commission of this robbery of another drug-dealer so he could (a) eliminate any competition to the drug-trafficking conspiracy and (b) sell the stolen cocaine for the benefit of the

---

[7] DaRyan's two-month living arrangement with Defendant selling the same drugs Defendant's conspiracy sold may not be sufficient to prove DaRyan was guilty of the crime of conspiracy beyond a reasonable doubt. *See, e.g.*, *United States v. Small*, 423 F.3d 1164, 1182–85 (10th Cir. 2005); *United States v. Evans*, 970 F.2d 663, 670–71, 673–74 (10th Cir. 1992). But here we are analyzing whether DaRyan was a co-conspirator for the purpose of finding relevant conduct under U.S.S.G. § 1B1.3. And for this purpose, which need be made by only a preponderance of the evidence, *see Damato*, 672 F.3d at 847, the evidence sufficiently establishes DaRyan was more likely than not a co-conspirator.

14

conspiracy. This conclusion is not without support: both this Court and other circuits have referenced the obvious desire drug-trafficking organizations have to further their own interests by eliminating or controlling the actions of rival organizations. *See, e.g.*, *United States v. Hutchinson*, 573 F.3d 1011, 1017 (10th Cir. 2009) (observing that a drug-trafficking organization used violence against "rival drug dealers who threatened their commercial dominance of the area's drug trade"); *United States v. Nieto*, 721 F.3d 357, 362 (5th Cir. 2013) ("As part of *ensuring control over the drug trade* in Midland–Odessa, the Aztecas require all members in prison to report to the local Aztecas leader once released, charge all non-Aztecas drug dealers a tax (or 'cuota'), [and] rob and assault non-Aztecas dealers who do not pay the cuota." (emphasis added)); *United States v. Rodriguez-Reyes*, 714 F.3d 1, 14 (1st Cir. 2013) (observing that a drug-trafficking organization had murdered a rival drug-dealer "to eliminate competition and protect the defendants' own drug trafficking activity").

We are thus unpersuaded by Defendant's contention that "[t]he district court made an assumption, unsupported by any evidence," Appellant's Br. 17, when the court concluded it is "common knowledge that drug dealers rob each other to steal money and drugs and . . . carry weapons to execute robberies and to defend themselves from robberies." Besides the fact that this is a common motif of drug dealers, the district court's conclusion did not require, as Defendant seems to suggest, *direct* evidence through testimony or some other means that Defendant's motivation in the attempted robbery was to further through violence the interests of the drug-

15

trafficking conspiracy to which he belonged. Instead, "[b]ecause a criminal conspiracy by its very nature is usually shrouded in a further conspiracy of silence, the common plan or purpose must often be, and may legitimately be, proved by *circumstantial* evidence." *Hutchinson*, 573 F.3d at 1035 (alteration in original) (emphasis added) (quoting *United States v. Robertson*, 45 F.3d 1423, 1442 (10th Cir. 1995)) (internal quotation marks omitted). And this case is ripe with circumstantial evidence: Defendant was in a conspiracy that distributed cocaine, Defendant organized an attempted robbery meant to deprive another man of cocaine, and the man was not just a random target who happened to have cocaine but instead a rival drug-dealer who was likely impeding the commercial interests of Defendant's organization.

We therefore agree with the district court that a "reasonable conclusion that you could draw from the evidence here is that the robbery and death did occur in connection with the conspiracy." As the district court aptly (if not a bit forcefully) put it, Defendant's involvement in both the robbery and the conspiracy is a "damning connection." Thus, we hold DaRyan Pryor's death as a result of the attempted robbery is relevant conduct under the combination of § 1B1.3(a)(1)(A) and § 1B1.3(a)(3), and we consequently hold the district court did not err in utilizing the cross-reference under § 2D1.1(d) to raise Defendant's base offense level to 43.[8]

---

[8] Defendant does not argue on appeal that the circumstances surrounding DaRyan's death could not constitute First Degree Murder under 18 U.S.C. § 1111 or that the death did not otherwise meet § 2D1.1(d)(1)'s requirements. He instead relies solely on his contention that DaRyan's death is not conduct relevant to his conspiracy

16

III.

Defendant next contends the district court erred in applying the leadership enhancement under U.S.S.G. § 3B1.1(a), which mandates a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Defendant's argument on this issue is two-fold: First, he claims his only leadership role was his organization of the attempted robbery. He therefore asserts this single event is insufficient to warrant the leadership enhancement because he proved in his discussion about the murder cross-reference under § 2D1.1(d) that the attempted robbery and conspiracy were not connected. Second, he contends that "even if the robbery attempt was linked to the drug conspiracy," his leadership "was so limited and minor it could not support the four level leader/organizer enhancement imposed by the district court." Appellant's Br. 23, 26.

We review de novo the application of a Guidelines enhancement "to the extent the defendant asks us to interpret the Guidelines or hold that the facts found by the district court are insufficient as a matter of law to warrant an enhancement." *Irvin*, 682 F.3d at 1276–77 (quoting *United States v. Hamilton*, 587 F.3d 1199, 1222 (10th Cir. 2009)). We have held, however, that the "district court's determination that Defendant was an organizer or leader of a criminal activity involving five or more

conviction under § 1B1.3. But because DaRyan's death is in fact relevant conduct, we refuse to adjudicate new arguments not relied upon by Defendant and instead assume the district court correctly applied the other conditions § 2D1.1(d)(1) dictates.

17

persons" is a factual determination that we review for clear error. *United States v. Cruz Camacho*, 137 F.3d 1220, 1223–24 (10th Cir. 1998). And like cross-references, sentencing enhancements also need be determined by only a preponderance of the evidence. *United States v. O'Brien*, 560 U.S. 218, 224 (2010).

As an initial matter, we hold Defendant's first argument must fail in light of our conclusion that the attempted robbery was relevant conduct to Defendant's underlying conspiracy conviction. As to his second argument that Defendant's leadership in the attempted robbery was so "limited and minor" as to not warrant the enhancement, we begin by noting that "while the criminal activity requires five or more participants, the *leadership role* need only be over 'one or more other participants.'" *United States v. Hamilton*, 587 F.3d 1199, 1222 (10th Cir. 2009) (emphasis added) (quoting U.S.S.G. § 3B1.1(a), cmt. n.2). Furthermore, we have held that "[t]his is not a particularly onerous showing: 'The Guideline requires only a conclusion that [the defendant] supervised at least one such participant; it does not require the court to identify specific examples.'" *United States v. Gallant*, 537 F.3d 1202, 1241 (10th Cir. 2008) (second alteration in original) (quoting *United States v. Aptt*, 354 F.3d 1269, 1287 (10th Cir. 2004)). We also look to specific factors in determining whether we should apply the leadership enhancement, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, . . . the degree of participation in planning or organizing the offense, . . . and the degree of control and authority exercised over others." *Hamilton*, 587 F.3d at 1222 (ellipses in original) (quoting

18

U.S.S.G. § 3B1.1(a), cmt. n.4) (internal quotation marks omitted).

The district court did not clearly err in applying the leadership enhancement, for the evidence presented at the sentencing hearing supports its finding that Defendant led one of the participants (DaRyan) of a criminal activity (the underlying conspiracy) that involved five or more participants (by our count, the conspiracy involved at least nine other participants when DaRyan is included). Defendant specifically enlisted DaRyan to commit a robbery he had organized with the ultimate goal of advancing the operations of a drug-trafficking organization to which they both belonged. He then gave DaRyan a mask and a gun so he could commit the robbery. Defendant's actions during its commission were also consistent with those of a leader and organizer: he sat and watched the attempt from the safety of his vehicle while the man he recruited did his bidding, much like a general would watch his troops wage a war. Moreover, DaRyan had been living with Defendant for at least two months prior to the attempted robbery while Defendant paid for all of his living expenses in exchange for his work selling drugs, which buttresses the district court's conclusion that Defendant acted as his leader. DaRyan's own mother even stated that "when [DaRyan] would talk about [Defendant] . . . he was just like he thought [Defendant] was God, honestly. [Defendant] did everything for him."

Given that a court need not make a "particularly onerous showing" to apply the leadership enhancement, the evidence in this case is sufficient to support a conclusion that Defendant was an organizer and leader over at least one other co-conspirator. Because the underlying conspiracy for which Defendant was convicted

19

involved "five or more" other co-conspirators, we hold the district court did not clearly err in applying the four-level leadership enhancement under U.S.S.G. § 3B1.1(a) to Defendant's sentence.

IV.

Defendant's third argument on appeal is that the district court erred in applying a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. Although he concedes (1) the district court ordered him to provide a voice exemplar, (2) he refused to do so, and (3) the district court held him in contempt for that refusal, he contends, like he did at his sentencing hearing, that "[h]is plea of guilty . . . eliminated any obstruction of justice his refusal to provide voice exemplars may have created." Appellant's Br. 20. He bases this argument heavily on *United States v. Scott*, 405 F.3d 615 (7th Cir. 2005), where the Seventh Circuit held the district court erred in applying the obstruction of justice enhancement when the defendant "was not . . . making it more costly or otherwise more difficult for the government to prosecute its case against him successfully." *Id.* at 618.

As this is an enhancement, it need be proven only by a preponderance of the evidence. *O'Brien*, 560 U.S. at 224. And while generally "[a] district court's decision to enhance a sentence for obstruction of justice is reviewed only for clear error," *United States v. Gillespie*, 452 F.3d 1183, 1189 (10th Cir. 2006) (citing *United States v. McCann*, 940 F.2d 1352, 1359–60 (10th Cir. 1991)), we conduct a de novo review "to the extent the defendant asks us to interpret the Guidelines or hold that the facts found by the district court are insufficient as a matter of law to warrant

20

an enhancement," *Irvin*, 682 F.3d at 1276–77. Because Defendant asks us to interpret whether § 3C1.1 allows his guilty plea to purge him of the obstruction of justice enhancement, de novo review is appropriate.

U.S.S.G. § 3C1.1 states:

If (1) the defendant willfully obstructed or impeded, or *attempted to obstruct or impede*, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct . . . increase the offense level by **2** levels.

U.S.S.G. § 3C1.1 (emphasis added). Given § 3C1.1's language that attempts to obstruct justice warrant a two-level enhancement, we recently rejected in *United States v. Mays*, 606 F. App'x 911 (10th Cir. 2015), an unpublished decision, an essentially identical argument to the one Defendant now makes in an essentially identical context to the one Defendant was in, i.e., the failure to provide a voice exemplar that resulted in an order holding the defendant in contempt of court. *Id.* at 919–20. Specifically, we held the obstruction of justice enhancement "clearly applies to attempts" whether or not the attempt was fruitless or successful. *Id.* at 919. Although this case is not binding, we find its logic sound and note that adopting its holding has support from other circuits. *See, e.g.*, *United States v. Carter*, 510 F.3d 593, 599 (6th Cir. 2007) ("[Section] 3C1.1 applies to attempted obstruction, and [the defendant's] actions satisfy the attempt provisions of § 3C1.1 regardless of whether any actual obstruction occurred."); *United States v. Maccado*, 225 F.3d 766, 772 (D.C. Cir. 2000) ("[T]he conclusion that a plea could erase an actual obstruction of

21

justice would be inconsistent with § 3C1.1's inclusion of attempts.").

We further note Defendant's reliance on *Scott* is unavailing, for the defendant in that case merely "violate[d] the conditions under which he was being detained" by occasionally leaving the confinement facility he had been ordered to reside in for personal reasons entirely unrelated to the prosecution. *Scott*, 405 F.3d at 617. The defendant in *Scott*, therefore, was not even *attempting* to make the prosecution against him more difficult—he was merely engaging in disrespectful conduct that "flout[ed] the court's authority," an action the Seventh Circuit held insufficient to warrant an obstruction of justice enhancement. *Id.* Here, on the other hand, Defendant quite clearly *did* attempt to make prosecution against him more difficult: he intentionally refused to provide a voice exemplar the Government had a legal right to possess because he knew it could be used to identify his voice in incriminating situations. *See United States v. Flanagan*, 34 F.3d 949, 953 (10th Cir. 1994) ("It is well-settled that requiring a defendant to provide a voice exemplar for purposes of identification rather than for the testimonial content of the exemplar does not violate the Fifth Amendment's privilege against self-incrimination.").

We thus hold Defendant attempted to obstruct justice when he refused to give his voice exemplar, his subsequent guilty plea did not purge him of this refusal, and the district court did not err in applying the two-level enhancement under § 3C1.1.

V.

Defendant's final argument on appeal is that the life sentence the district court imposed on him was so severe and disproportionate as to be substantively

22

unreasonable. "Substantive reasonableness involves whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)," *United States v. Conlan*, 500 F.3d 1167, 1169 (10th Cir. 2007) (citing *United States v. Kristl*, 437 F.3d 1050, 1053 (10th Cir. 2006)), and we review a sentence for substantive reasonableness "under a deferential abuse-of-discretion standard," *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1214 (10th Cir. 2008) (citing *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008)). "[A] within-Guidelines sentence is entitled to a presumption of substantive reasonableness on appeal," *Alapizco-Valenzuela*, 546 F.3d at 1215, and we will "find an abuse of discretion only if the district court was arbitrary, capricious, whimsical, or manifestly unreasonable when it weighed the permissible § 3553(a) factors," *United States v. Sanchez-Leon*, 764 F.3d 1248, 1267 (10th Cir. 2014) (quoting *United States v. Sayad*, 589 F.3d 1110, 1116, 1118 (10th Cir. 2009)) (internal quotation marks omitted).

Defendant proffers two arguments that his life sentence was substantively unreasonable. First, instead of analyzing the reasonableness of his sentence under the § 3553(a) sentencing factors, he alludes back to the district court's decision to apply the § 2D1.1(d) murder cross-reference and argues this decision, although allowed by law, was substantively unreasonable. Although he concedes the Government needed to prove this relevant conduct by only a preponderance of the evidence, he argues that "when the result of . . . utilizing a minimal standard of proof is to impose the most severe term of imprisonment allowed by law [a life sentence] for a conviction

23

for the sale of [a relatively small amount of] cocaine, the reasonableness of that sentence is called into serious question." Appellant's Br. 28–29. He asserts at least one other circuit has held a sentence that relied on a murder cross-reference to be substantively unreasonable, pointing to the First Circuit's decision in *United States v. Lombard*, 72 F.3d 170 (1st Cir. 1995). In that case, the First Circuit vacated a defendant's mandatory life sentence after it determined that attributing murders to the defendant through a cross-reference

> operated not merely to ratchet up his prison term by some fractional increment, but rather wholly to remove the defendant's sentence from the term-of-years continuum and transform it into a life sentence without the prospect of parole. That punishment represents the second most severe penalty known to the law. . . . [T]he enhancement at issue not only increased the duration of [the defendant's] sentence, but placed his punishment on an entirely different order of severity.

*Id.* at 178 (second alteration in original) (citations omitted) (internal quotation marks omitted).

But *Lombard* is distinguishable on at least two significant grounds. First, that case was decided before the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), during a time when the Sentencing Guidelines were mandatory. After ruling the district court had the authority to grant the defendant a downward departure and was not obligated to impose a mandatory life sentence on him, the First Circuit remanded the case to the district court to *decide* whether a downward departure was warranted. *See Lombard*, 72 F.3d at 172 ("We vacate the life sentence and remand for a determination of whether a downward departure *might* be warranted in the unique circumstances here." (emphasis added)). The court did not hold, as

24

Defendant would have us read the case, that it was substantively unreasonable to impose a *discretionary* life sentence from a murder cross-reference on the defendant, but instead only held that a *mandatory* life sentence was inappropriate. *Id.* at 186 (noting that the court was concerned with Guideline cross-references imposing life sentences "where the judge is seemingly *mandated* to impose that sentence" (emphasis added)).

Second, the district court that originally sentenced the defendant in *Lombard* had *wanted* to depart downward but felt it did not have the authority to do so. *Id.* at 172 ("The sentencing judge was greatly troubled but felt as a matter of law that he had no authority to do otherwise under the Guidelines."). Clearly, the district court in Defendant's case did not have these same reservations and never suggested in any way it felt Defendant deserved a sentence less than life imprisonment. In fact, the district court alluded to the opposite conclusion, stating, "[W]hy would we sentence him the same as somebody that did not enlist other people to commit crimes which result in death and did not organize or lead the conspiracy? Why would it make sense to treat him as if these facts didn't exist?" *Lombard* consequently does not offer us any real guidance, and because we have not otherwise held the application of a murder cross-reference can make a sentence substantively unreasonable and are not persuaded we should begin such an unprecedented trend now, we reject Defendant's first argument for his contention that his life sentence is substantively unreasonable.

Defendant invokes the § 3553(a) sentencing factors (although without explicitly saying so) for his second argument and argues that because (1) his adult

25

criminal history includes only convictions for marijuana possession and drug paraphernalia, (2) he has served "numerous terms of probation but has served no appreciable imprisonment term before this," and (3) giving him a life sentence at his relatively young age of 32 "means there is no hope for rehabilitation," a life sentence is "unjustly harsh." Appellant's Br. 30. But because we presume Defendant's within-Guidelines sentence is substantively reasonable, *Alapizco-Valenzuela*, 546 F.3d at 1215, none of these facts or circumstances leave us with a firm conviction the district court "was arbitrary, capricious, whimsical, or manifestly unreasonable when it weighed the permissible § 3553(a) factors." *Sanchez-Leon*, 764 F.3d at 1267. Instead, we agree with the district court's observation: why should we pretend like Defendant did not organize an attempted robbery that resulted in the death of a man over whom he had a significant amount of control and influence? We therefore hold the district court did not abuse its discretion in imposing a sentence of life imprisonment on Defendant.

VI.

Although Defendant Christopher Craig pleaded guilty to only drug-trafficking crimes, he also organized the robbery of a rival drug-dealer for the benefit of the conspiracy in which he was involved, recruited two men to commit the robbery, gave the men the firearms necessary to perpetrate this crime, and oversaw the attempt from the safety of his car while one of the men—a man who we are told looked up to him as God Himself—was shot and killed. Even though Defendant asserts he "would have went to court [to] try to have the jury decide [his] fate" if he "would have

26

known [he] was going to end up with life with just the sentencing," Sent. Tr. vol. 2, 355:18–21, Aug. 28, 2014, the district court had the authority to consider this conduct in imposing a sentence on Defendant under U.S.S.G. § 2D1.1(d). The court also did not err in applying the four-level leadership enhancement under § 3B1.1(a) or the two-level obstruction of justice enhancement under § 3C1.1, and Defendant's sentence of life in prison was not substantively unreasonable. The district court's judgment is therefore

AFFIRMED.