**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 13, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ALMUNDO CRUZ SINGER,

    Defendant - Appellant.

No. 15-2169

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. 1:15-CR-00065-MCA-1)**

---

Submitted on the briefs[*]:

Wayne Baker, Esq., Law Office of Wayne Baker, Albuquerque, New Mexico, for Defendant-Appellant.

Damon P. Martinez, United States Attorney; Sarah J. Mease, Assistant United States Attorney, Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **BRISCOE, BALDOCK** and **MURPHY**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

    [*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is, therefore, submitted without oral argument.

Defendant Almundo Cruz Singer pleaded guilty to one count of involuntary manslaughter in Indian country, in violation of 18 U.S.C. §§ 1153 and 1112, and was sentenced to a term of imprisonment of seventy-five months, to be followed by a three-year term of supervised release. Singer now appeals, challenging the procedural and substantive reasonableness of his sentence. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I

Singer's offense of conviction stems from his involvement in a motor vehicle accident that occurred on December 9, 2014, in Church Rock, New Mexico. Marvin Ahasteen and his wife were walking from their Church Rock residence that day to eat lunch at the Fire Rock Casino, which is located on the north side of New Mexico State Highway 118. The couple jogged across the lanes of State Highway 118 and, as they did so, Mrs. Ahasteen "jogged in front of her husband" and "reached the [north] side of the highway." ROA, Vol. 2 at 3 (Presentence Investigation Report). At that moment, Mrs. Ahasteen "heard her husband exclaim 'oh sh[it]' and turned to see him hit by a white car driving westbound" on State Highway 118. Id.

According to an eyewitness who had left the casino in a vehicle and entered onto the westbound lane of State Highway 118 shortly before the accident, the white vehicle passed him on State Highway 118 at a high rate of speed in a no-passing zone and swerved in front of him prior to hitting Mr. Ahasteen. The eyewitness did not observe the

2

white car "slow down" or "any brake lights" activate on the white car prior to hitting Mr. Ahasteen. Id. at 4. According to the eyewitness, "he heard a 'boom' upon impact and saw 'dust and glass spraying.'" Id. The eyewitness observed the white car cross the eastbound lane of State Highway 118 and drive into some bushes after striking Mr. Ahasteen. The white car, according to the eyewitness, then returned to the westbound lane of State Highway 118 and drove away at a high rate of speed.

Mr. Ahasteen was decapitated as a result of the accident, his "left leg was dismembered at the proximal tibia and fibula," id. at 6, and his "body parts, blood and clothing were scattered over a distance of approximately 274 feet," id. at 4. Further, "[a]s a result of the force of impact, all of [Mr. Ahasteen's] clothes were removed, aside from his underwear that came down to his knees and his right sock." Id. at 7. According to Mrs. Ahasteen, she "saw [her husband's] naked body and then . . . saw his body with no head hit the pavement. His head came off from his body." Id. at 3.

"[S]hortly after the accident, a McKinley County deputy driving eastbound . . . in Gallup[, which is located just west of the casino,] observed a white car driving westbound . . . at a very high rate of speed in a posted 25 mph zone." Id. at 4. "The deputy noted extensive windshield damage to the car as well as a partially cave[d] inward roof with a red stain on it." Id. "The deputy made a U-turn to initiate a traffic stop." Id. As he did so, he "called dispatch to advise of" his intentions "and was informed [that] the [white] vehicle was recently involved in a hit and run of a pedestrian at the Fire Rock Casino." Id.

3

The deputy activated "his lights and siren while behind the white car, but the driver [of the white car] refused to pull over." Id. "The driver [of the white car] was unable to maintain his lane of travel and proceeded to drive into oncoming traffic, forcing other vehicles off of the roadway." Id. "The [white] vehicle led the deputy and a secondary responding deputy on a chase while driving 80 mph in a 50 mph zone." Id. During the chase, the white car "hit multiple curbs . . . and caused another vehicle to drive into oncoming traffic to avoid collision." Id. The white car ultimately stopped in the parking lot of a Family Dollar store in Gallup. "The deputies were unable to open the driver's side door of the [white] vehicle due to the damages and therefore instructed the driver . . . to exit through the passenger side door." Id. "Deputies immediately [noted] a strong odor of intoxicating beverage coming from inside the [white] vehicle." Id. They also "noted blood on the [driver's] fingers and facial area," as well as "glass all over his head and face." Id.

The driver was taken into custody and identified as defendant Almundo Cruz Singer. Singer "exhibited erratic behavior that led [the] deputies to believe he may be under the influence of something more than alcohol." Id. This behavior included Singer "urinat[ing] on himself and repeatedly tr[ying] to pull off his shorts," bringing "his handcuffs [in front of] his body" and "kick[ing] the inside of the deputy's car." Id. Singer also "made comments about fleeing and laughed about the pursuit stating, 'haha you guys couldn't get me'" and "'it took you that long? Haha.'" Id.

Singer was taken to a local hospital to have his blood drawn. "[A]t the registration

4

desk," Singer "began grinning and giggling," shaking his head "as if he was cracking his neck," and "jumping up and down." Id. at 5. Singer also twice attempted to "head butt" a male deputy. Id.

The toxicology report that resulted from the blood draw revealed that Singer's blood alcohol level was 0.18g/100mL. Because of the level of Singer's blood alcohol, the laboratory did not conduct further testing for the presence of illicit substances.

A law enforcement official "reconstructed the accident scene using videos recorded by several video surveillance systems in the casino's parking lot." Id. at 6. The accident reconstruction evidence "showed [Singer']s car to have been traveling 87 mph in a 55 mph zone" prior to impact, and "[t]he speed at the moment of impact was calculated to be 84 mph." Id.

II

Because Singer is Native American and the accident occurred in Indian Country, a criminal complaint was filed against Singer in federal district court charging him with one count of involuntary manslaughter, in violation of 18 U.S.C. §§ 1153 and 1112.[1] A federal grand jury subsequently indicted Singer on the same charge. On April 17, 2015, Singer pleaded guilty to the single count alleged in the indictment.

---

[1] Section 1153 provides federal criminal jurisdiction over Indians who commit certain offenses, including manslaughter, "within the Indian country." 18 U.S.C. § 1153. Section 1112 criminalizes involuntary manslaughter, which it defines as "the unlawful killing of a human being without malice . . . [i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." 18 U.S.C. § 1112(a).

The probation office prepared a presentence investigation report (PSR). The PSR, in accordance with U.S.S.G. § 2A1.4, applied a base offense level of 22. The PSR then applied a two-level enhancement pursuant to U.S.S.G. § 3C1.2, noting that Singer "recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." ROA, Vol. 2 at 10. After applying reductions for acceptance of responsibility pursuant to U.S.S.G. §§ 3E1.1(a) and (b), the PSR arrived at a total offense level of 21. That total offense level, combined with Singer's criminal history category of I, resulted in an advisory Guidelines sentencing range of 37 to 46 months.

Singer appeared before the district court for sentencing on September 16, 2015. The district court overruled Singer's objection to the PSR's proposed two-level enhancement pursuant to U.S.S.G. § 3C1.2 and adopted the PSR's proposed calculations in their entirety. The district court then announced that it would "impose a two-level upward departure" pursuant to U.S.S.G. § 5K2.14. ROA, Vol. 3 at 70. In doing so, the district court stated:

> I do find that . . . the defendant's actions endangered the community to an
> exceptional degree and that his failure to abide with the traffic laws in the
> operation of a vehicle, with a blood alcohol level over twice the legal limit,
> and the dangerous pursuit [he] led law enforcement on placed multiple lives
> at risk of death or serious bodily injury during the commission of this
> instant offense and immediately thereafter.

Id. The upward departure resulted in a total offense level of 23 and, in turn, an advisory Guidelines range of 46 to 57 months. The district court also concluded that the

6

sentencing factors outlined in 18 U.S.C. § 3553(a)(1) through (7) "warrant[ed] a sentence outside of the applicable guideline range." Id. at 71. The district court explained:

> After considering and evaluating these factors, I find that the defendant's acts caused what I would term a brutal death of the victim in this case. These acts resulted in the victim's decapitation, disfigurement, dismemberment, evisceration of his organs, as well as his clothes being stripped off his body, and all of this occurred in the presence of the victim's wife.

> The defendant committed the instant offense while his driving privileges were revoked and while on bond and [subject to] conditions of release[.] He had been arrested [six] months earlier.

> He knowingly assaulted a law enforcement officer twice.

Id. The district court also stated that it "f[ou]nd that a sentence above the advisory guideline imprisonment range w[ould] be reasonable, and sufficient but not greater than necessary to accomplish the sentencing goals inherent in and set forth in" 18 U.S.C. § 3553(a). Id. at 71–72. Ultimately, the district court "committed [Singer] to the custody of the Bureau of Prisons for a term of 75 months," to be followed by a three-year term of supervised release. Id. at 72. The district court also ordered Singer to "make restitution to the New Mexico Crime Victims Reparation Commission in the amount of $5,873.21." Id. at 75.

### III

On appeal, Singer asserts three challenges to the sentence imposed by the district court. First, he contends that the district court erred in applying a two-level enhancement pursuant to U.S.S.G. § 3C1.2. Second, he contends that the district court erred in

7

imposing a two-level upward departure pursuant to U.S.S.G. § 5K2.14. Third, he

contends that his sentence is substantively unreasonable because the district court lacked

a valid basis for varying upward from the advisory Guidelines range. As discussed

below, we conclude that all three of these arguments lack merit.

*The § 3C1.2 reckless endangerment enhancement*

Singer contends that the district court, in the course of calculating his total offense

level, erred in applying a two-level enhancement pursuant to U.S.S.G. § 3C1.2. By this

contention, Singer is challenging the procedural reasonableness of his sentence. "We

review challenges to the procedural reasonableness of sentences for an abuse of

discretion." United States v. Worku, 800 F.3d 1195, 1201 (10th Cir. 2015).

In calculating Singer's total offense level, the district court began by employing a

base offense level of 22 pursuant to U.S.S.G. § 2A1.4. Section 2A1.4 governs

involuntary manslaughter offenses and requires the use of a base offense level of 22 "if

the offense involved the reckless operation of a means of transportation." U.S.S.G.

§ 2A1.4(a)(2)(B). The district court in turn imposed a two-level enhancement pursuant to

U.S.S.G. § 3C1.2. Section 3C1.2, entitled "Reckless Endangerment During Flight,"

states: "If the defendant recklessly created a substantial risk of death or serious bodily

injury to another person in the course of fleeing from a law enforcement officer, increase

by 2 levels." U.S.S.G. § 3C1.2.

Singer argues that this two-level enhancement should not have been imposed in

light of Application Note 1 to § 3C1.2. Application Note 1 states, in pertinent part: "Do

8

not apply this enhancement where the offense guideline in Chapter Two . . . results in an equivalent or greater increase in offense level solely on the basis of the same conduct." U.S.S.G. § 3C1.2 cmt. n.1. Singer argues that the base offense level of 22 that was applied by the district court pursuant to § 2A1.4 already took into account what he describes as his "reckless driving." Aplt. Br. at 9. More specifically, Singer argues that he "hit the victim and continued driving until his apprehension and arrest." Id. Thus, he argues, he engaged in one continuous course of reckless driving that was fully taken into account by § 2A1.4 and the base offense level of 22.

We reject Singer's arguments. By applying a base offense level of 22 pursuant to U.S.S.G. § 2A1.4, the district court relied on two basic facts: that Singer had committed the crime of involuntary manslaughter, and that the reckless operation of a vehicle was involved in the commission of that crime. The district court's enhancement of Singer's offense level pursuant to U.S.S.G. § 3C1.2 was based on different conduct: the actions he took fleeing from the scene which created a risk of serious bodily injury or death to another person. At the time of sentencing, the district court expressly found that Singer's flight was separate from the conduct that resulted in the death of Mr. Ahasteen. In particular, the district court agreed with government counsel that Singer "had every opportunity to stop for the police" following the accident but refused to do so, and instead fled for "approximately 20 minutes," during which "[h]e traveled upwards of 80 miles per hour" and "endangered lives of innocent passersby and motorists." ROA, Vol. 3 at 34. Singer does not challenge these findings as clearly erroneous and, even if he had, we

9

would conclude that those findings are amply supported by the record.  We therefore conclude that the district court did not abuse its discretion in imposing the two-level enhancement pursuant to § 3C1.2.

*The § 5K2.14 upward departure*

Singer next argues that the district court, in calculating his total offense level, erred in departing upward two levels pursuant to U.S.S.G. § 5K2.14.  We analyze the propriety of an upward departure by applying a four-part test that "inquires (1) whether the district court relied on permissible departure factors, (2) whether those factors removed a defendant from the applicable Guidelines heartland, (3) whether the record supports the district court's factual bases for a departure, and (4) whether the degree of departure is reasonable."  United States v. Robertson, 568 F.3d 1203, 1211 (10th Cir. 2009).  Our analysis of these factors "proceeds under a 'unitary abuse of discretion standard,' which affords substantial deference to 'factual questions,' but allows for 'plenary review of questions that are in essence legal.'"  Id. (quoting United States v. Alapizco-Valenzuela, 546 F.3d 1208, 1215-16 (10th Cir. 2008)).

In departing upward two levels, the district court relied on U.S.S.G. § 5K2.14, entitled "Public Welfare."  Section 5K2.14 states that "[i]f national security, public health, or safety was significantly endangered, the court may depart upward to reflect the nature and circumstances of the offense."  U.S.S.G. § 5K2.14.  The district court concluded that § 5K2.14 was implicated in this case because it found that Singer's "actions endangered the community to an exceptional degree."  ROA, Vol. 3 at 70.  More

10

specifically, the district court found that Singer's

> failure to abide with the traffic laws in the operation of a vehicle, with a blood alcohol level over twice the legal limit, and the dangerous pursuit [he] led law enforcement on placed multiple lives at risk of death or serious bodily injury during the commission of this instant offense and immediately thereafter.

Id.

Singer does not dispute that, generally speaking, the factors listed in § 5K2.14 can operate as permissible bases for an upward departure. Nor does he dispute the factual findings made by the district court in support of the departure. Instead, he argues that those facts were already taken into account by the district court in setting his base offense level and in applying the two-level reckless-endangerment enhancement. In other words, Singer argues, "[t]he district court's upward departure pursuant to 5K2.14 essentially amounts to triple-counting, or at least double-counting." Aplt. Br. at 11.

We readily conclude that no double or triple counting occurred in Singer's case. "Double counting," and by necessity the so-called "triple counting" alleged by Singer, "occurs when the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes." United States v. Jim, 786 F.3d 802, 815 (10th Cir. 2015) (quoting United States v. Joe, 696 F.3d 1066, 1070 (10th Cir. 2012)). Although the base offense level of 22 that was applied by the district court in this case took into account the fact that the offense of conviction (involuntary manslaughter) "involved the reckless operation of a means of transportation," U.S.S.G. § 2A1.4, it most

11

certainly did not take into account Singer's blood alcohol level, the extreme degree to which he exposed other members of the public to a risk of serious injury or death immediately prior to and after hitting Mr. Ahasteen,[2] his post-accident flight from law enforcement officers, the length or nature of that flight, or the degree to which he exposed law enforcement officers and members of the public to danger during that flight.

Nearly the same can be said for the § 3C1.2 reckless-endangerment enhancement that was imposed by the district court. As previously noted, that enhancement was based upon Singer "recklessly creat[ing] a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. By its plain language, § 3C1.2 did not take into account Singer's blood alcohol level, the fact that multiple people were exposed to a risk of serious injury or death as a result of Singer's conduct immediately prior to and after hitting Mr. Ahasteen, i.e., before fleeing from law enforcement officers, or the fact that Singer's conduct while fleeing from law enforcement officers exposed multiple people, rather than the single person referred to in § 3C1.2, to the risk of serious injury or death. When comparing the two provisions, § 5K2.14 permits upward departures in extreme cases where multiple persons, the "public," are placed in extreme danger as a result of a defendant's conduct. Those conditions were clearly met here.

We therefore conclude that the district court did not abuse its discretion departing

---

[2] Shortly prior to hitting Mr. Ahasteen, Singer passed two cars at a high rate of speed. And, immediately after hitting Mr. Ahasteen, Singer lost control of his vehicle and crossed the oncoming lane of traffic.

upward two levels pursuant to U.S.S.G. § 5K2.14.

*Substantive reasonableness of the sentence*

In his third and final issue on appeal, Singer argues that the seventy-five month term of imprisonment imposed on him by the district court is substantively unreasonable because the district court lacked a valid basis to vary upwards from the advisory Guidelines range. "Substantive reasonableness involves whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." United States v. Craig, 808 F.3d 1249, 1261 (10th Cir. 2015) (quoting United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)). "[W]e review a sentence for substantive reasonableness 'under a deferential abuse-of-discretion standard.'" Id. (quoting Alapizco-Valenzuela, 546 F.3d at 1214). "[W]e will 'find an abuse of discretion only if the district court was arbitrary, capricious, whimsical, or manifestly unreasonable when it weighed the permissible § 3553(a) factors.'" Id. (quoting United States v. Sanchez-Leon, 764 F.3d 1248, 1267 (10th Cir. 2014)).

The seventy-five month sentence that was imposed by the district court in this case was eighteen months, or approximately 31.5%, above the high end (fifty-seven months) of Singer's advisory Guidelines sentencing range. When a district court decides to impose a sentence above the advisory Guidelines range, it "must consider the extent of the deviation [from the Guidelines] and ensure that the justification is sufficiently compelling to support the degree of variance." United States v. Lente, 759 F.3d 1149, 1158 (10th Cir. 2014) (alteration in original) (quoting Gall v. United States, 552 U.S. 38,

13

50 (2007)). Our role, in turn, is not "to decide de novo whether the justification for a variance is sufficient or the sentence reasonable." Id. (quoting United States v. Smart, 518 F.3d 800, 808 (10th Cir. 2008)). Rather, "we must . . . defer not only to a district court's factual findings" in support of a variance, "but also to its determinations of the weight to be afforded to such findings." Id. (quoting Smart, 518 F.3d at 808).

In deciding to impose a sentence above the advisory Guidelines range, the district court cited three factors: (1) what it characterized as the "brutal death of the victim . . . in the presence of [his] wife," including his "decapitation, disfigurement, dismemberment, evisceration of his organs, [and] his clothes being stripped off his body"; (2) the fact that Singer committed the offense within approximately six months of being arrested in Gallup, New Mexico, for driving under the influence of alcohol, having "his driving privileges . . . revoked," and "while on bond and conditions of release"; and (3) the fact that Singer "knowingly assaulted a law enforcement officer twice" after being arrested in connection with the accident.[3] ROA, Vol. 3 at 71.

Singer argues that the facts of Mr. Ahasteen's death cannot properly serve as a basis for upward variance. Although Singer acknowledges that "the impact of [his] vehicle resulted in a gruesome horrific scene," he argues that "it was an unintentional act and result" and he notes that Mr. Ahasteen "immediately expired upon impact as he was

[3] The government states in its appellate response brief that the district court also based the variance on Singer's failure to abide with the traffic laws, his blood alcohol level, and the dangerous nature of his flight. That is incorrect. As previously discussed, the district court cited those factors in support of its decision to impose a two-level upward departure.

14

decapitated." Aplt. Br. at 21. Singer further notes that he "did not torture the deceased, or gratuitously inflict injury upon him or prolong his pain." Id.

While we generally agree with Singer on these points, we conclude that they fail to address the district court's real concern. As we read the district court's statements at the time of sentencing, the district court was primarily concerned with the fact that the "brutal death" of Mr. Ahasteen occurred "in the presence of [his] wife." ROA, Vol. 3 at 71. Indeed, we note that the district court's statements occurred shortly after it heard Mrs. Ahasteen speak about witnessing her husband's death and the impact that observing his death has had on her.[4] In short, we conclude that the district court effectively found that Mrs. Ahasteen was an indirect victim of the crime, one who suffered psychological trauma from Singer's crime, and it in turn determined that this factor was not otherwise taken into account by the Guidelines. See United States v. Terry, 142 F.3d 702, 712 (4th Cir. 1998) (holding that the term "victim," as used throughout the Guidelines, includes those indirect victims who "have some nexus or proximity to the offense"). Singer does not dispute either the district court's factual finding or its legal determination and, in any

---

[4] Mrs. Ahasteen told the district court, in pertinent part:

> My husband – his cap was laying in that picture. That's where his foot was, still in his shoes, still with his sock on. His torso was further away. And he got hit so hard, he was blown out of his clothes. And from this area, right here to right here, he was shredded all the way down to the bone. I had to see that. And I saw it. And I turned, and I saw his head bounce along off of him, like a basketball, into the weeds.
> That is something I will not forget.

ROA, Vol. 3 at 61.

event, we find no error in either regard. The underlying facts surrounding Mr. Ahasteen's gruesome death and his wife's direct observation of his death are undisputed. Further, we agree with the district court that the effective victimization of Mrs. Ahasteen, as a result of witnessing her husband's death, is an aspect of "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), that was otherwise not accounted for by the Guidelines applicable to Singer's case.[5]

Singer next complains that "[t]he district court also placed undue influence on [his] prior DWI arrest." Aplt. Br. at 22. In support, Singer argues that "[t]he government never presented any testimony to support the accusations with respect to which there were no convictions," and "[t]he district court never made a finding that those accusations were true." Id. We reject Singer's arguments. Although it is true that the government presented no evidence at the sentencing hearing regarding Singer's prior arrest for DWI, that is because Singer did not dispute paragraph 60 of the PSR, which detailed his June 6, 2014 arrest for DWI, the fact that his license was revoked as a result of that arrest, and the fact that he "was released on bond and conditions of release on June 10, 2014." ROA, Vol. 2 at 13. Moreover, we conclude that these facts were properly considered by the district court pursuant to 18 U.S.C. § 3553(a)(1) as part of Singer's "history and characteristics," as well as pursuant to 18 U.S.C. § 3553(a)(2)(C) in terms of the need "to protect the public from further crimes of the defendant." In other words, the undisputed

_____

[5] The government asserts, and we agree, that the district court could have departed upward on the basis of this same factor pursuant to U.S.S.G. § 5K2.3, which addresses "Extreme Psychological Injury" suffered by the direct or indirect victims of a crime.

16

facts regarding Singer's prior DWI arrest establish Singer's willingness to drive without a valid license and a troubling pattern of reckless driving while under the influence of alcohol. We note his reckless, drunken driving which resulted in Mr. Ahasteen's death occurred a mere six months after his release on bond from his prior DWI arrest. We therefore conclude that the district court acted within its discretion in deciding to vary upwards from the advisory Guidelines sentencing range on the basis of this factor.

Notably, Singer does not dispute the district court's factual finding that he "knowingly assaulted a law enforcement officer twice" after his arrest, ROA, Vol. 3 at 71, nor does he argue that this was an improper basis for an upward variance. Further, Singer does not, apart from the arguments we have already addressed, separately challenge the amount of the variance imposed by the district court.

For these reasons, we conclude that the district court did not abuse its discretion in imposing the seventy-five month term of imprisonment.

IV

The judgment of the district court is AFFIRMED.